THE FIRST MUNICIPALITY v. PEASE et al.

In appeals from decisions of justices of the peace, in cases involving the constitutionality or legality of a municipal ordinance imposing any tax or impost, the power of the court is limited to the question of the constitutionality or legality of the ordinance. Const. art. 63.

The General Council of the city of New Orleans are authorised to establish by ordinance an uniform rate of wharfage, to be paid by ships, steamers, and other vessels, moored in front of any part of the city. The authority to impose a wharfage, or charge on vessels moored in the port of New Orleans, to defray the expenses of the erection and maintenance of wharves and other works necessary for the loading and unloading of vessels, and to secure a convenient access to them, is not inconsistent with any law of the State or of the United States, nor with the 8th or 10th sections of the first art. of the constitution of the United States.

Where a municipal corporation is authorised to impose a wharfage charge, as a compensation for keeping the wharves in a proper condition for the safe and expeditious shipping and landing of merchandise, a court will not undertake to fix any limit to the amount which the municipal authorities may exact for that purpose. The question of the extent to which this right may be exercised, is purely administrative.

APPEAL from the Parish Court of New Orleans, *Maurian*, J. The facts of this case are stated in the opinion of the court, *infra.*

First
Municipality
v.
Pease.

*Roselius*, for the plaintiffs,   I. The ordinance is legal.   The 20th section of the act of 1836, dividing the city into three municipalities, provides: "The following are declared to be the powers of the city counsel thus constituted, and all other powers shall be vested in the councils of the separate municipalities: 1st. To fix a uniform rate of wharfage, to be paid by ships, steamboats, and other crafts, mooring in front of all parts of the city."

So far, therefore, as the State legislation is concerned, the power has been expressly delegated to the General Council.   This law, however, is not the origin of the right to claim wharfage.   It is well known that, by an ordinance of *O'Reilly*, enacted shortly after Spain took possession of Louisiana, this right was recognised; and it has never been seriously questioned since that period, until the institution of this suit.   In nearly all the other seaports in the Union, wharfage is paid to private individuals, who own the wharves, and keep them in repair.

II. The ordinance is not contrary to the constitution of the United States, nor to any law of Congress.   The constitutional provisions relied on by defendants are: Art. 1, sec. 8, § 1. "The congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts, and provide for the common defence and general welfare, of the United States."

Also, § 3 of the same article and section: "To regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

And the same article, sec. 9, § 5: "No tax or duty shall be laid on articles exported from any State."

Finally, the same article, sec. 10, § 2: "No State shall, without the consent of the Congress, lay any imposts, or duties, on imports and exports, except what may be absolutely necessary for executing its inspection laws.   No State shall, without the consent of Congress, lay any duty of tonnage."

The wharfage claimed is either a tax, impost, or duty, in the proper and legal acceptation of these terms?   The Supreme Court of Louisiana, in the case of *The State* v. *The New Orleans Navigation Company*, 11 Mart. 324, say: "These words, we think, must be confined to the idea they commonly and ordinarily present to the mind—exactions to fill the public coffers for the payment of the debts, and the promotion of the general welfare of the country; not a retribution provided to defray the expenses of building bridges, erecting causeways, or removing obstructions in a water course, to be paid by such individuals only who enjoy the advantage of such labor and expense."   See also 11 Johnson, 80.   Story on the Constitution, vol 2, p. 419, § 947, *et seq.*

In Petersdorff's Abridgment, vol. 15, p. 393, we find the following definition, or rather description, of a wharf: "A wharf is a convenient place for landing, warehousing, and shipping of goods.   Natural ground on the bank of a canal, though used for the purpose of a wharf, is not a wharf; neither is the sea-beach.   *Rex* v. *Regent's Canal Company*.   The term, in its ordinary and legal import, means a place built or constructed for the purpose of loading and unloading goods, and for the use of which *wharfage*, or compensation, is paid to the owner."   The word wharfage is also used to mean the money paid by vessels for the privilege of mooring, or making themselves fast, at a wharf; in some of the cities of the Union, this is called *dockage*.   Wharfage is, therefore, a remuneration or compensation for the use of a wharf, and can with no propriety of language be confounded with a tax, duty or impost.

The collection of wharfage is not a violation of the constitutional provision which gives Congress the power to regulate commerce.   See 2 Peters, 252.   9 Wheaton, 195.   12 Ib. 446.   6 Peters, 315.   11 Ib. 143.   9 Wheaton, 235.   10 Peters, 662.

*Elmore* and *W. W. King*, for the appellants.   The ordinance of the city council of May 23d, 1843, imposing a tax upon vessels landing or mooring within the incorporated limits of the port, is void.   The power conferred upon the city by the act of 1836, s. 20 (B. & C.'s Dig. p. 127), does not, by its terms, grant a new power.   It was merely intended to regulate the manner of exercising a power previously in existence.   The only power previously in existence was the right to receive the old spanish dues prescribed by the act of incorporation in 1805.   These dues were very small in comparison with the taxes levied by the ordinance of 1843.

The power conferred by the act of 1836, was repealed by the act of 1843, p. 55 of Acts.   The right of vessels to land or moor on the banks of the river, is secured to them.   C. C. 442, 443, 446, 448.   Act of Congress of 1812, ad-

mitting Louisiana into the Union. Also Ord. of 1811 of the convention of Louisiana. The act of 1843 deprived the city of the power of laying a wharfage tax.

The city council must regulate the port so as to admit steamboats to moor at the levée, between certain points. Act of 1835. City Laws, pp. 493, 425, The ordinance is in contravention of these laws, for it imposes a most oppressive tax upon steamboats, for the enjoyment of this right. The ordinance is not authorised by the act of 1836, because it does not import on its face to be a wharfage tax. It is a tax for mooring or landing within the incorporated limits of the port of New Orleans.

The port of New Orleans extends from the line of the parish of Jefferson to a point three miles below the centre of the public square, called the Place d'Armes, taking in the whole width of the river and both shores. In other words, a section of the river of about five miles in extent. See Act of 1821, Moreau's Dig. p. 259. Acts 1834, p. 106. Steamboats are liable to the tax, whether they land on this, or on the other, side of the river. Whether they moor to a wharf or not. There are no wharves on more than half of the two shores, They are liable whether they discharge a cargo or not. The ordinance calls these taxes, levée taxes. The levée and the wharves are very distinct things. The money received from these taxes goes into the public coffers, and is not appropriated for the benefit of the wharves. The tax in amount is greatly beyond a fair compensation for the use of the wharves.

These considerations show that the tax is not a wharfage tax, nor a remuneration for the use of the wharves in dicharging and receiving cargoes. It is not then a tax warranted by the law of 1836. It is not pretended that there is any other law. The tax is imposed by the city upon property not within the limits of the city. The port of New Orleans is not within the incorporated limits of the city. Act of 1836, B. & C.'s Dig. p. 121. Act of 1812, Martin's Dig. vol. 2, p. 288. Act of 1818, City Laws, p. 317. Act of 1819, City Laws, p. 319. 5 La. 466. 17 La. 576. C. C. arts. 444, 446, 448. Consequently the city has no right to lay the tax, under any general authority or power conferred upon it.

The ordinance is void because it is contrary to the 6th section of the constitution of the United States, which prohibits any State from imposing any tonnage duty. The charge imposed by the ordinance is essentially a tonnage duty. States which have imposed such duties, have first obtained permission from Congress. See Gordon's Dig. no. 2265 and note. Georgia, South Carolina, and Maryland have obtained such licences, by temporary acts. It is contrary to art. 1, sec. 8, of the constitution of the United States, which gives Congress the right to regulate commerce among the several States. This power in Congress is exclusive, and embraces the regulation of navigation. *Gibbons* v. *Ogden*, 9 Wheat. 186 *et seq.* *United States* v. *Coombs*, 12 Peters, 72. *Brown* v. *State of Maryland*, 12 Wheat. 419. Act of Congress of 1812, admitting Louisiana into the Union. A tax upon the importer is a tax upon the goods. 12 Wheat. 419. *A fortiori*, a tax upon the ship, is a tax upon the goods.

It is contrary to art. 1, sec. 10, of the constitution of the United States, which forbids any State laying imposts or duties on commerce, or any duty on tonnage. The ordinance lays a duty on the internal commerce of the States, 12 Wheat. 419. 9 Ib. 186, *et seq.*

It is in contravention of the acts for the admission of Louisiana into the Union. See act of Congress of 20th Feb. 1811, and 8th April, 1812. Act of Louisiana Convention. 11 Mart. 324, note to decision.

The judgment of the court was pronounced by

EUSTIS, C. J. This is an action for the recovery of the sum of $82, alleged to be due for the wharfage of the steamer *Sultana*. It is before us on an appeal from the late Parish Court of New Orleans, which rendered judgment for the plaintiffs, in affirming the judgment rendered by a justice of the peace of New Orleans, before whom the suit was originally brought. Under the constitution, the power of this court in appeals of this kind is limited to the legality and constitutionality of the ordinance, under which the claim of the plaintiffs is sought to be enforced. *The Third Municipality* v. *Blanc*, 1 Annual Rep, 385.

I. The General Council of New Orleans has power to fix one uniform rate of wharfage, to be paid by ships, steamers, and other water-craft, mooring in front of any portion of the city. Act of 1836, § 20. So far as the authority of the State is concerned, the plaintiffs have a right to exact wharfage from a steamer moored in front of the municipality within its limits; and our opinion is that, so far as the ordinance establishes an uniform rate of wharfage, it is not in violation of any law of the State or of the United States.

II. But it is alleged to be in violation of the constitution of the United States in this, that it is contrary to the 8th section of the first article of that instrument, which gives Congress the power to regulate commerce with foreign nations, and and among the several States, and with the Indian tribes, and to lay and collect taxes, duties, imposts and excises; and conflicts with the tenth section of the same article, which provides that no State shall, without the consent of Congress, lay any duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, and that no State shall lay any duty of tonnage without the consent of Congress.

There is no charge authorised by law for the landing or shipping of goods, or for any other use of the land or fixtures adjacent to the water; and the wharfage claimed by the plaintiffs is placed on the ground of its being a compensation for the artificial facilities which are afforded to vessels, in mooring them in safety, in loading or unloading their cargoes, and in furnishing an easy and convenient access to them. The landing and shipment of the bulky produce of this mart, is effected by means of stages which extend from the vessel to the shore. In some parts of the port there are floating bridges between them, and without the means provided for that purpose the port, as a place for shipping, could only be used at a very advanced rate of expense over its present rates, and accompanied with such inconvenience and loss of time, that it may surely be assumed that the works, which the municipality have caused to be constructed with their apparatus, may be considered necessary and useful. This, as a fact, we do not understand to be drawn in question, and we think that it may be assumed that, the exaction of wharfage, as a fair remuneration for the expenses thus incurred, and those which are probably to continue for the same object, is, under no view that can be taken, contrary to the letter or spirit of the constitution of the United States.

But it is contended by the learned counsel, that the amount of the wharfage exacted under this ordinance, is entirely out of proportion to any such object; that it is a tax levied on the commerce of the country, for the general benefit of the inhabitants of New Orleans; that it is a source of revenue and profit to them; and that the form in which it is imposed is a mere pretence to cover what is in fact an unconstitutional tax or impost, levied on objects which neither the municipal nor State authority has the power to reach or interfere with.

In the present case, it is in evidence that the steamer *Sultana*, a licensed coasting vessel of the United States, of upwards of five hundred tons burthen, was employed in the Vicksburg and intermediate trade with this port; that she made one voyage a week, between the two places; and that the sum of $82 is exacted for wharfage, on her mooring in any part of the limits of the municipality. It is urged that the aggregate thus exacted in the course of a season is such a tax upon the navigation, foreign and internal, as to be a palpable and flagrant violation of the constitution of the United States.

We consider it competent for the legislature to authorise the receipt of

wharfage, as a compensation or remuneration for keeping the bank of the river in such a condition as to ensure the safe and expeditious shipment and landing of merchandise and produce, by the construction of a spacious and convenient levée and quay suitable for a mart like this, and for projecting wharves with necessary appendant machinery. Wharfage is exacted, it is believed, in all the maritime ports of the United States; its exaction has never been considered unlawful, nor in derogation of any right secured under the constitution of the United States, so that the question before us is one of degree. Wharfage may lawfully be demanded; but beyond a reasonable renumeration—a compensation for an equivalent—it is said to be unconstitutional.

There are statements in evidence by which it appears that, from June, 1836, to February, 1845, the expenses of the port fell short of the receipts from wharfage, by $43,939; and from February 28th, 1845, to the 31st March, 1846, though the statements are not definite, it is apparent that the receipts far exceeded the expenditures. The gross receipts from that source were $74,000, and the "*fournitures diverses* pour le port, pavage, et *autres travaux de reparation pour la municipalité*," are put down at "*a peu pres*" $61,120. On the other hand it is proved, that on account of the abrasion of the soil on the border of the river, which takes place on the fall of the water in the summer, the bridges are liable to be destroyed; that the wharves between Custom-house street and Hospital, were destroyed four times in five years, in 1840, 1841, 1843, 1844. It is also contended that the statements do not contain all the charges that ought to be made to the account of the port, and that the receipts from wharfage do not exceed the expenditures chargeable to the port expenses direct, and those incidental, and a reasonable sum to meet those caused by the destruction and injury of the wharves and the repairs of the port, according to the usual action of the river upon the bank and batture in front of it, on which some of the wharves are constructed.

The matter we are thus called to decide is purely administrative. We are called upon to fix the sum which the municipality may receive as wharfage; and to refuse to award any sum beyond what we may deem lawful, as a fair remuneration for their port expenses, actual, prospective, and contingent. There could scarcely be a stronger illustration than this case offers, of the wisdom and truth of the dictum of Chief Justice *Marshal*, in the case of *McCulloh* v. *The State of Maryland*, 12 Wheaton, 430: "We are not driven," says he, "to the perplexing enquiry, so unfit for the judicial department, what *degree* of taxation is the legitimate use, and what degree may amount to the abuse, of the power." The functions of that department are, under the true theory of our government, confined to those cases in which its authority cannot be questiioned, and its action will be consequently effectual. *Second Municipality* v. *Duncan*, ante. p. 182.

If the court were to reduce the amount as asked by the defendants, an accident might render its judgment not only contradictory to the very principle on which it would be founded, but its execution an unwarrantable interference with things over which the municipal government must necessarily have the control.

The government of each municipality is charged with the administration and police of its portion of the port, the preservation of the levée, as well as with its own financial affairs. The authority delegated to them for the former object

is a portion of the political power of the State, and its exercise appertains to the public order, and involves the safety of the city in certain seasons of the year. The reasoning of the Chief Justice in the case cited, may be applied to a certain extent to the case under consideration. The government of the municipality has determined that the rates of wharfage are due, as such; from this the State has not dissented. The responsibility of the act rests with the municipal government. The consequence of the interference of the judicial power in the details of its finances, can be readily foreseen. If it be appealed to in cases in which the amount of its imposts, taxes, or dues, are drawn in question, and should exercise its authority in matters of detail, or those which may be considered as administrative, it is obvious that the administration of municipal affairs must be arrested, unless the judicial power took upon itself the responsibility of conducting them, and provided against the consequences of its decrees.

It would seem, therefore, to be true that, within a certain range, which however it is not easy to define or limit, where there is an acknowledged right which is necessary for the performance of a public function and which is liable to abuse, that the measure of its use and abuse is rather a matter of legislative discretion than for judicial decision; where there is no right, however small the burden or laudable the purpose to which it is applied, the judiciary must interfere. If this wharfage is a tax on commerce, or on imports or exports, it is unconstitutional, however small the amount. If it be not *per se* unconstitutional, the unconstitutionality depending according to the argument on the unreasonableness of the amount, the action of the judiciary is brought directly in conflict with the municipal administrative power on an administrative question, over which, it must be conceded, that the city government is called upon to exercise to a certain extent discretionary power. The judicial action is put forth in favor of absolute, positive, legal rights; they must be separated by a distinct line of demarcation from those which are subject to the action of other branches of the government, the interference with which must be avoided. Such is, as we understand it, the theory of our sytem; and upon the observance of the principle of leaving to each branch of the government the performance of the functions with which it is invested, its success and durability depends.

The force of the argument addressed to us presupposes that a proper case has been made out for the judicial power. The impolicy of this ordinance, the disastrous consequences of imposing burthens on commerce, and the inevitable effect of such a course of exaction on the interests of the State and city, may be as serious and as certain as is contended for on the part of the defendants.

We are far from believing that the charges imposed by the ordinance, are consistent with a proper and considerate view of those interests. The remedy for this can be had elsewhere than from the judicial power. With more enlarged views of public policy, the electors may apply at once a remedy to the evil; or the legislature itself may confine the exactions of the municipalities within fixed and reasonable limits. The States of the Union bordering on the waters of this great valley, and the great shipping interest of the north, whose interests are most affected by our port charges, will be sure, in case of necessity, to call into activity for their protection the power of Congress to regulate commerce.

It cannot be believed that, if it were attempted, a State holding the great entrance from the ocean to large and populous internal States and cities, would be

permitted, under our present political organisation, to embarrass foreign and domestic trade by unreasonable and unnecessary burthens; which would be alike inconsistent with our settled policy, the principles of our government, and the laws of nations, as we understand them.   1 Kent's Com. 35.   Wheaton's Law of Nations, p. 508.

But the sole question with us in this point is, whether, under the evidence, it is competent for the judicial power to declare the ordinance unconstitutional? We are under the necessity of saying that, we have nothing before us on which we can determine that the wharfage claimed by the plaintiff is contrary to the constitution of the United States, by reason of its amount.

III.   It is contended by the defendants that the ordinance is in contravention of the acts of Congress, for the admission of Louisiana into the Union, of February, 1811, and the 8th of April, 1812.   The reasons for which we have considered the ordinance as not conflicting with the constitution of the United States, apply to the acts referred to, giving them all the effect which the defendants assign to them.

It is the wish of the defendants that the opinion of the Supreme Court of the United States should be had on the subject involved in this suit, in which we cordially acquiesce.   We have therefore confined our decision exclusively to the propositions submitted and argued, without presenting many obvious considerations in support of our views, which result from the constitutional jurisprudence of the United States, as established by the decisions of that tribunal.

*Judgment affirmed.*